Thank you, counsel. We'll now proceed with SCIE v. XL. Good afternoon, Your Honors. Henry Bensvie for the Plaintiff Appellant, SCIE and PayPix. And if I could refer to them as entertainment partners, which is how the briefs refer to them, I think it will be easier. Could you – we don't talk beforehand, so I don't know what my colleagues think. But if you call them the producers and the payroll people, it's easier for me. The payroll company. A new trial on damages is warranted whenever a jury reaches a damages number that is nowhere, no how based on the evidence presented to them. And that's exactly what this case is about. In this case, the jury was given a jury instruction that read, in order to prove a breach of surety obligation, entertainment partners, the payroll company, must prove by a preponderance of the evidence that worldwide acting as agent for XL assumed the obligations of the producers. And it goes on. And the jury verdict form read exactly the same thing, assumed the obligations. It didn't say assumed some of the obligations. It didn't say assumed particular obligations or some or all. It said all of the obligations. Not only that, no one argued, neither side argued, that the jury could decide that only some of the obligations were assumed. The jury was not free to decide that they assumed obligations from here on, but before the bonding company stepped in, it was between the principals? If the jury, I suppose in theory, could have reached that conclusion, if someone had argued that to them or if the instruction had allowed them to do that, but it didn't. And there was no argument made that only post-bond obligations were the ones that were assumed. The only evidence before the jury on this claim, not the other claims. The other claims, the fraud claims, the jury could have parsed out damages in a lot of different ways. But on the surety obligation claim, it found that the bonding company assumed the obligations of the producers. It seems to me a little confusing to speak of the surety claim, because the contract didn't help you. It's only the fact they came in and took it over that you acquired some rights. Correct. Correct. They did take it over. And that's what the assumption was. Right. But I'm just saying that it's not a surety contract. It's just an assumption. It's an assumption. The surety company assumed the obligations of the producers. Right. Right. And the obligations at issue are the payroll companies. Right. The obligations, the producers' obligation to pay the payroll company. Right. And that amount had been determined. That amount had been determined in another proceeding. $3.2 million. I mean, it was an exact number. In round numbers, it was $3.2 million. And that's why we made the new trial motion for damages. What the surety company said at the trial court and what they say now in response to that is, well, this is essentially sheer speculation. They say, well, the jury must have assumed, excuse me, the jury must have concluded that the bond company only assumed obligations that arose after the bond was issued. Now, there are a lot of flaws with that whole argument beyond the fact that it's speculative. Could you go beyond the speculative nature? Because as I understand it, we're supposed to reach pretty far to try to justify what a jury does. Why is it just untenable that the jury decided that? It is untenable for a number of reasons. First, you look at the numbers themselves. Juries are entitled to estimate damages in some instances. And they came up with a precise dollar amount, a perfectly round number, $1.75 million. Now, if you look at the actual numbers before the jury, there's no way you get to that number. You can — That isn't the number you get after the bond? Or, I mean, after the bonding company steps in? No. What you get, depending on how you slice the numbers, is either 1.7, I think 1.77 million and changing. But you get to a precise number. Or you get to $2.4 million, depending on how you slice it. Wait, $1,770,000, pretty close to $1,750,000. And if this were an emotional distress claim or a pain and suffering claim, I would say, that's fine. I'd be inclined to think it's just jury rounding error. Well, it's — $20,000 difference on almost $2 million? About a 1 or 2 percent difference? It is a small difference. But when they have the exact numbers before them — We have a lot of cases saying they don't have to buy an exact number. They don't have to buy an exact number, but when both sides agree on what those exact numbers are, why do they get to estimate somewhere close to that? I don't think there's any support for their doing something like that. $1,770,000 was one number, and the other one was how much? Roughly $2.4 million. $2,400,000. And these were the two numbers that the evidence supported for after the bonding company stepped in. If what the jury wanted to say was, before the bonding company stepped in, you were on your own with the principal. After the bonding company stepped in, you were entitled to get paid by the bonding company. Except you're doing apples and oranges, and let me explain why. In all commercial contracts, the payments are applied to the oldest obligations first. Now, what the surety has to say and what you have to believe to say the jury's concluded only post-bond obligations are the ones that count. At the time the bond was issued, there was about a million dollars owed to my client. That million dollars was paid within two weeks after the bond. Did you have a lien supporting that? I'm sorry? Were there liens supporting that million? No. You had no security for it? No. So why did they have to pay it? Why did the... No, but I think you say they assume the project, but in order for the project to go ahead, they didn't need to pay you off if you didn't have any security. They didn't need to pay us off except they took over the film. Now, remember, the bond is issued. Maybe the timing's not clear. The bond is issued in January 2001. The takeover occurs in July 2001. So the takeover occurs long after all of my client's work is done. And they paid not the bond company, the producers paid for some of that amount of money during the course of the project. Now, if the jury, as the surety company says, if the jury found that the only obligations that were incurred were after the bond was issued, not after the assumption occurred. Now, I just don't understand how that makes any sense at all. When a surety company takes over, it steps into the shoes of whoever its principal is. And so it takes over all the obligations. I'm not sure. I've never been involved with a movie contract before, but as far as I can tell, it's hard to distinguish from construction litigation. And it did some of that. And when the bonding company takes over and tries to complete a building after the contractor goes bust, they typically try to avoid paying the contractor's debts to the maximum extent they can get away with it and still get the building done. They try to, but if there's litigation, I mean, there may well be a negotiation involved. And if the vendor doesn't have the leverage to force it or doesn't want to go into litigation, there may well be a negotiation. But we believe and we think California law supports this. Civil Code Section 1589 says someone who accepts the benefits of a contract assumes all its obligations. And that's exactly what the surety company did here. They got the benefit of my client's work. They own the film now? They do. It's their film. And they sold it? Do you know what they've done with it? I don't know. I mean, I've heard some things. It's all outside the record. From what is before the court, they had owned the film, they completed it, they were trying to market it. At the time of the trial, it had not been successfully marketed. Now, you first sued the producer. We did. He had no assets at all? He defended the claim, but an arbitrator ruled in my client's favor. That's right. Why didn't you collect something? Oh, he had no assets. That's right. So were his wages attached? We tried a number of different things. I didn't handle that case. No, but it's curious that you get that arbitration award, you can't get a penny out of it? Not a penny. I know we've tried, others have tried. There's an individual and two companies, and the two companies no longer exist for all intents and purposes. The individual does exist. He's supposedly an independent contractor, not employed by anyone. All his assets are in someone else's name. I'm sort of going far afield. If I remember what the record showed was that the producer was basically an empty shell, so that no individuals were really on the hook, except to the extent that somebody made a commitment. So a lender made a commitment, but got a completion bond, that sort of thing. Am I remembering the right case? No, the film was an empty vehicle, but the man was very much alive. Didn't he give a personal guarantee as well? He did. Yeah. He did. Not that that was worth anything. Sure. But yes, he did, and typically that's how motion pictures are made. Let me ask you a question related. If I were to agree with you on this issue, that the jury's verdict of 1.75 is not supported by the evidence, does that mean you just get an automatic reversal and go back and redo the damages issue? We don't have to go on and consider mitigation, or do we have to also consider mitigation? I don't think you have to consider mitigation in this context, because mitigation has the same flaws here. For a jury to say the damages are 1.75 million when they had the ability to come up with a precise number, and the failure to mitigate is exactly 1.75 million, when, again, they could have come up with a precise number depending on how they wanted to make a decision, I think you have to throw out the whole thing in terms of damages. That doesn't mean – I also believe that this comes – if there's a reversal, it comes back and we file a summary judgment motion. I don't think there's actually going to have to be a trial. Could you explain a little more what the basis was for that $1,770,000 figure? Yes. The total – and I can cite you to the record if Your Honors want to see the background. But the total dollars for the payroll from start to finish was $5,998,037. I've cut off the cents in all the numbers. $5,998,037. $5,998,037. Okay. The evidence showed that $2,578,991 was paid to entertainment partners after the bond was issued. And $1,018,644 at the time the bond was issued. And if you deduct what it was owed at the time the bond was issued and deduct the payments it received after the bond was issued, you get to – that gets you the $2.4 million number. And I'll explain how you get to the $1.77 million number. Let's see. If you deduct what from what? If you deduct – you're deducting from the total payroll bill. You deduct from the $5,998,000. So you're always deducting from that. That's the total cost of the payroll part of the film. You deduct what was owed at the time the bond was issued. That's $1,018,000 and something – $1,019,000. Okay. You deduct the amount entertainment partners was paid after the bond. Which was the 2.75? 2.7578991. I thought it was $2,578,991. Yes. You deduct both those numbers, $1,018,000 and $2,578,000 from the $5,998,000. $2 million. And that gets you the $2.4 million. I understood that Anthony Hopkins was to be paid $6 million when principal photography started. Yes. Isn't that part of the payroll? Typically. What? Typically lead actors, people like an Anthony Hopkins, are outside of the payroll system. Outside the payroll. And his was outside the payroll system. They didn't handle that at all. We didn't touch his payroll. And I think there are other lead actors who got paid in the range of $2 million or $3 million. Typically the lead actors do not fall into the payroll companies' purview. Now we're down to $2.4 million and something. Okay. That's right. How do we get down to $1.7? You get down to that. When you add in the bills that were issued after the bond was issued for work that was performed before the bond was issued, that's another $616,947. And so you take that away from the $2.4 million. And that gets you to $1,773,454. So it sounds like the jury basically gave you reimbursement for all the work done after the bond was issued. Yes, except for $20,000. Well, except that some of the payments made to entertainment partners after the bond was issued was for the work performed before the bond was issued. So entertainment partners says, I mean, how do you know somebody pays you part of their bill, and you say, oh, that's for the case I handled for you last year that you never paid me for. And they say, no, no, that's for the new case that I just retained you on. Well, when $600,000 of that comes in three days after the bond is issued, and another $1.3 million comes in two weeks after the bond is issued. Did anyone say one way or the other or agree one way or the other explicitly? No. I don't think there was any conversation on that. But it could only have been for that. Let me tell you how it looks to me so that you can educate me to look at it differently. Frankly, the way it looked to me when I looked at the verdict form is the jury thought this is all about fraud. We don't buy the fraud. And then at the end of the verdict form, there are a couple questions about the assumption, yeah, they assumed it, and we're going to give them all the payroll that they paid after they took over, and nothing from before they took over because before they took over, the payroll company was working on the credit of the producer who went bust. That's the way it looked to me. And it looks like the number difference is trivial, one or two percent, not worth setting it back for. Juries' fingers aren't so swift on a calculator, and three jurors get three different numbers, and they say, ah, 750. That's the way it looks. What am I missing here? Except it's not after the contracts were in fact assumed. The contracts were assumed months later. This is after the bond. The theory is after the bond is issued. Now, the assumption occurs months after the bond is issued, months after Entertainment Partners has incurred all its obligations, months after the filming, principal photography, which is when all the work gets done, when you need the payroll company. That is all done. They're in post-production when the contracts are assumed. So logically, the jury could have said Entertainment Partners gets nothing because the contract got assumed after Entertainment Partners was done, or Entertainment Partners gets everything for the same reason. But it really can't say after the bond is issued because bond issuance is sort of an irrelevant concept in the context of whether the jury assumes the obligations or not. And that's where I think the flaw in the argument is. Even if you accept the notion that the fingers don't really work on the calculators and close is good enough, I don't think close is good enough when you can come precisely. And we're not talking about a complex algorithm where you have to have software and all this stuff. It's not a complex algorithm. It's just seven-digit numbers, and you rounded yourself when you presented them to us. I rounded, but I didn't round so much that I just threw $20,000 or $30,000 away. That's what you have to assume the jury did. They rounded so much, so illogically, they had to say, okay, if it's after the bond is issued, but the payments that are made for the obligations arising before the bond is issued, well, that works against entertainment partners, too. That works against the payroll company. And there's no logic to that. There's just no sense to say, well, if the only liability arises after the bond is issued, then why do the obligations then arise? Would your argument be exactly the same if the jury had gotten the cents wrong? If they'd gotten the cents wrong? If the testimony and documents presented to the jury allowed for one or two figures, and the jury awarded a figure that was neither one of the two figures, but the only difference was the cents after the decimal point, the pennies, would your argument be exactly the same? My argument would be the same. There wouldn't be an appeal because it wouldn't be cost effective to do something like that. So it would be the same logic. It's just that as a practical matter, we wouldn't see the case. Exactly. But for $20,000 or $30,000? I think when a jury has the ability to come up with an exact number and fails to do so. I mean, if you've got two numbers in front of the jury. I have a vague recollection that I wrote a decision myself saying the contrary, but I can't remember the name of it. Well, I haven't seen that case, Your Honor, so I don't know. Maybe I'm wrong because I can't remember. And it also depends on the kind of claim. We've got what is in essence a contract claim. If we had a tort claim or we had pain and suffering or emotional distress, those are inherently uncertain numbers and you can never come up with a precise calculation. Just to be sure I understand it, your position is your client went on for a period extending credit to the producer without any security. Is that right? That's correct. I mean, they may well, you know, you can fault them for making a bad business decision, but they did so also in reliance on being told there was a bond in place. I mean, that gets into the other issues in the case. They were capable of asking for the contract, weren't they? Oh, absolutely. They could have asked for it. They were told a bond is in place. Their understanding. The completion bond was in place. That's the only kind that exists in motion pictures? It is. As far as I know. In construction, the completion bond would secure the lenders, but there would be another surety bond to secure the mechanics and material men. There's typically just one bond. People in the entertainment industry don't parse out the language of what kind of bond it is. There was evidence in the record on their summary judgment motion and on. . . My concern is all a completion bond says in construction is you will actually get a building at the end of this, not just a hole in the ground with some rotting two-by-fours over it. That's all it says. It doesn't say that the mechanics and material men will actually get their bills paid if the contractor goes bust. And this bond said much the same thing. The problem is my client's understanding, which was reasonable on the facts of this case, is that they would be protected by the bond. There was evidence before the Court on the 12B6 motion and on the summary judgment motion that the custom and practice in this industry is that completion bonds protect the vendors. Vendors can assert claims directly on the bonds. Are you saying the jury disregarded that evidence of custom or what? The trial court never let us put it on because she had granted a summary judgment motion on our claim of estoppel. She had. . . A summary of this appeal? It is. She had granted a 12B6 motion. There was someone from the bonding company who spoke to my client just before, not spoke, I apologize, who sent a letter to my client just before the bond was issued, the so-called mince memo, which we referred to in the briefs, that the trial court held as a matter of law was an opinion. And we think she was wrong. She specifically instructed the jury about that, which prejudiced the case as well. It sort of goes. . . It's a different issue than the damages issue, but it sort of goes to the whole issue around the trial. Thank you, counsel. Thank you. Good afternoon, Your Honor. Gary Valeriano for Star XL. Let me just first clarify where the numbers come from. We disagree with Entertainment Partners' recollection of the numbers, and this is in the record so the Court can check it for itself. But here's what I have. I have $4,361,351 being paid after, I'm sorry, being invoiced by his client after the bond was issued.  No, that would technically include. . . Well, by our calculation, yes, because payments weren't made until two weeks after they were actually incurred. So in other words, you do a job today, you don't get paid until, I think, two weeks from now. So if you look at the facts, yes, work done after the bond was issued would have first been billed on January 29th, I believe, 2001. That's the amount that we get. The next number is $2,608,990. That is the amount that was paid to Entertainment Partners after the bond was issued. Now, when you subtract that number from the amount they invoiced, you get $1,752,361. Now, that can be found, I'm sorry, in excerpts of Record 435. Our first number, the $4 million number, can be found in excerpts of Record 438, and the $2.6 million number can be found in excerpts of Record 504 to 509. So what we essentially have here is a jury making a decision and, yes, rounding off the numbers by about $2,000. But let me point out something further. These invoices that were submitted into evidence were done on a weekly basis so that the jury had to accept these numbers as this week, this entire week, this is the payroll number. The jury very easily could have said, well, we don't think that they should be billed for anything past Wednesday, but we don't know how much was billed Monday, Tuesday, and Wednesday because the invoices don't break it down. So the jury, I think, used its discretion in this regard in saying, okay, we'll round the figure off. That's the issue here. The jury spoke. The issue is, was there, in terms of the damages, what was the term of the contract? Let me quote from Glazer v. Glazer. Here the amount of damages depends in part on what is a reasonable term for the contract. In such cases, the fixing of damages is an integral part of the jury's function. Just recently, and after we had briefed the case, there was a case entitled DSU Medical Corp. v. JMS Company Limited. It's at 471 F. 3rd, 1293, 2006, Federal Circuit Court. Therein as well, the court upheld a jury's verdict based upon the fact that the jury had, in fact, determined the term of the contract, which was contrary to what the plaintiff had asserted. So the jury here instructed to do this? The jury was not instructed to do anything with respect to the contract. You've seen what the jury had in terms of a verdict form. They were asked, did my client breach its surety obligation or, I'm sorry, the actual question was did my client's agent, supposed agent, breach the surety obligation and assume the obligations of the producer? The next question was if you find yes, how much do you believe are damages? So if, as entertainment partners would have you believe, there's only one number you could plug in there, that is the $2.8 million number or whatever it was the damages were awarded, why in the world would we need that second question? And the answer to that, where we may have dropped the ball as attorneys, is by not asking them the question, what do you believe is the term of the contract? But that was never asked. But it was there. And clearly during the entire course of the trial, I argued that they were not responsible for damages before this point, nor were they responsible for damages after this point. The fact that the jury took that and put it in a contract context rather than in a fraud or negligent misrepresentation context is of no moment. I'll quote again from another case cited by entertainment partners in its brief. What date was it you said we're not responsible for damages before? Well, it was before the issuance of the bond, which was January 16 of 2001. And you said something else. You said you're not responsible after? That's correct. After the bond was issued? That goes to the mitigation argument. In other words, the plaintiff failed to mitigate its damages at this point, and therefore any of the Mitigation for just a moment. Okay. But you just confused things. Yes. Put mitigation aside. Okay. So what was the amount that they were responsible for then? When you said at this point, when you said you meant after the bond was issued, that was it? That was the only possible amount of damages that they could be liable for. That's right. Okay. Now, that's not the way the jury, the trial court instructed the jury. In what way? Well, the damage, the instruction that was given. In terms of the contract? Yes. The unpaid amount due to entertainment partners under its contract for devil productions. Yes. The unpaid amount due, which would necessarily require an interpretation of how much is due, i.e., what are you assuming? What have you assumed by assuming the contract? Are you assuming the entire contract, or are you assuming a part of the contract? And the jury was free to decide that point? They did.  I don't believe there are any instructions on that. Okay. Here's where we go with it, Your Honor. We don't need to speculate on what the jury thought. Really, their appeal is based on how rather than what. The question is, did the judge abuse her discretion in not requiring a new trial? Was this evidence ‑‑ I'm sorry. Was this against the clear weight of evidence in terms of what the jury found? We have the evidence. The evidence is clear. I'm trying to understand the verdict form here. The jury said worldwide, as agent for Star XL, assumed the obligations of the contract between devil and entertainment partners. Entertainment partners' damages for breach of the obligation were $1,750,000. Entertainment partners failed to mitigate, and the amount that entertainment partners could have avoided with reasonable efforts, and then it lists under suretyship $1,750,000. What theory did the instructions and arguments lay out for the jury to decide that? Was the idea you could have avoided the whole thing by just saying, we won't pay anyone else any payroll unless you pay off all the past debts plus the future ones? Yes. Or was it something different? Well, no, there were two actual theories. One was that the entertainment partners clearly knew that Mr. Glasser could not perform his obligations. They, in fact, terminated him during the course of the production. For whatever reason, they decided to give him another chance. It was after he gave them his guarantee and collateral, not only from him personally, but from his company, his holding company as well. Okay, so the jury thinks entertainment partners knows Glasser can't pay. That's right. What then? The second theory was that there was abundant evidence that entertainment partners was in consultation with various supposed investors in the film. They were calling entertainment partners saying, look, we're going to put a million dollars into this film, so please don't worry about your payroll. These were conversations that took place as early as, I think, mid-January of that year. Entertainment partners was talking to potential investors. Yes. Okay, next. I think that's in terms of what we expected in terms of mitigation. I don't understand what the mitigation is here. The mitigation is that they could have terminated their contract. They had that right at any time to terminate their contract and stop paying. They didn't do that. And they didn't do that based on anything they were relying on or counting on from my client. They were doing that for whatever reason, because of the business decision. For whatever reason is rather important. Well, I think it's a business decision. There were a number of things. Maybe they wanted to continue. Wait, what business? If they know Glasser can't pay, why not just take the million and say goodbye when the bonding company steps in? I don't understand what business reason there could be, except that they think the bonding company is going to bail them out. Well, there was a fraud action, a negligent misrepresentation action, and there was a finding against them on that. They argued that very, very loudly. There was no fraud. I'm sorry? There was no fraud. There was no fraud. There was no negligent misrepresentation. Your argument has to be consistent here. The jury has to be right for you to win. So there is no fraud. That's what the jury said. Have I got that right? The jury said there's no fraud. Okay. So what was the reasonable mitigation that they should have done, assuming they were not defrauded? The reasonable mitigation would have been to cease providing services. I think that's what we have here, is at a certain point they realized, one, that Glasser didn't have the money, two, that the production didn't have the money, and yet they continued to lend money to Mr. Glasser. Based on what? I'm not sure. Based on Glasser's assurances, he must be a very smooth talker. I don't know. I can't tell you what has to be. It has to have been based on the bonding company's assurances. But there was no assurance by the bonding company. Well, there was some. In what way? They may not have risen to the level of fraud, but there was some conversation with them. There was a conversation that we think the bond is going to issue sometime in the near future, and if it does, then we'll have funding for the film. But that really goes to the other issue, to the issue, actually, my appeal, because Starr XL has also appealed. But the issue here is whether there's any evidence to support the jury's verdict. And I think if you look at Exhibit 205, which is a complete listing of the invoices, and if you look at Exhibit 12, which is a complete list of the payments made during that period of time, I don't think you need to look any further. That supports the verdict. There's more than $4 million in invoices, which certainly supports a verdict of $1.75 million. And there's, again, more than $4 million. I'm sorry, there's about $2.6 million in payments, which certainly goes to, you know, when you combine those numbers, to the damage amount. So the issue here is we don't need to know what the jury actually thought. That's not part of the appellate process. All we need is some rational. All you need is any, any evidence to support the jury verdict. And we have that here. Well, there has to be some rational theory for the verdict. And there is. There is. I think we've pointed that out. Certainly the trial court accepted that in terms of their motion for a new trial. If I could move on just quickly to our appeal, because it does relate to the same issue. We are appealing the judgment as a matter of the denial of a judgment as a matter of law of our motion under FRCP 59. And that goes to the basis of even allowing this to go to the jury. The issue here is not only. . . You're cross appealing? Yes, we are. The issue here is not only was there not substantial evidence to support a finding that my client breached some surety obligation, but it's completely contrary to the law. As this Court has pointed out, this is a surety agreement. Surety agreements are very strict. We have tripartite relationships. This is similar to what we would consider a performance bond in a construction setting. That is, we are responsible, my client is responsible for one of two things. Either they complete and deliver the motion picture, that is delivery, or they pay off the loan. Here they chose eventually to pay off the loan. There was a takeover by WFC, but the film, and it's undisputed, was never delivered to the lender. Instead, the lender was paid off, and that is undisputed. That is who our obligation goes to. Do you own the film now? They did own the film, yes. Did they sell it? Yes, they did. For a substantial discount. They reaped the benefit. Well, Your Honor, they reaped the benefit of EP's work. Those people got paid. Those people got paid, and we have never disputed the fact that Entertainment Partners got a raw deal. We got a raw deal as well. We dealt with the same person. We paid nearly $15 million for a film that wasn't done and wasn't complete. They got a raw deal as well. They didn't sue for quantum merriment. They didn't sue in equity. They sued for fraud and negligence. They sued for breach of contract. None of those apply. And, again, let me go to the contract action because it's the surety ship. In this case, and the cases uphold this, I welcome the Court to look at these cases, for us to have assumed the contract and be obligated to them, it needs to be an executory contract which is performed after the assumption. We got no benefits after the assumption. The assumption took place in July. They were done in March. Oh, you did get a benefit. They didn't walk away. They could have walked away and left you in the lurch. I still do not understand why they didn't, unless the assumption was understood to be an assumption of what was owed as well as what would be coming. But the assumption didn't take place, as Mr. Benzias pointed out, until July of 2001. They were done with their executory contract in March of 2001. So it makes no sense. Unless they understood the issuance of the bond to amount to an assumption. There's no evidence of that. There's no evidence of that. With construction bonding, that is the way it works. A bond for a state or federal government project where there can't be any liens on the real estate, once that surety bond is out there, the mechanics and material men don't have to worry about getting paid. That's a payment bond. That's a different issue. This is a performance bond. We only have one obligee in this case. That is the bank. We don't have obligee, the individual obligees. Our bond doesn't require us to. The adversary said that a completion bond in the film business is treated as a payment bond. I don't believe that's true. You have to read the contract. The contract doesn't treat it as such. It has no third-party beneficiary provision. That's why the judge granted a summary judgment on the contract issue. I mean, even if you ignore standard surety law. I remember one of the letters that I read in the excerpts here was a representation, I think it was from the bonding company, that they were going to have to pay off entertainment partners. Yeah. That was one of the, in fact, the only thing the judge relied on in finding our intent to assume. That letter was written ten months after the takeover. So it makes absolutely no sense. Well, it suggests an understanding of what the contract was, what the bond meant from the time it was issued. But that letter comes from Worldwide and was written to my client. That's not a statement by my client. In other words, so much of the, we haven't even gone into the agency issue, whether Worldwide was our agent. So much of the agency issue depends on statements made either by Worldwide or other third parties that have, that aren't the principle in this case. So my client never made Worldwide their agent for purposes of taking over this contract. That is clear from the various contracts that we've cited in the brief. So in terms of a surety obligation, there is no requirement, there is no standard law that says as soon as a surety takes over, he takes over everything, antecedent obligations, whatever, with respect to third parties. Every case cited in our briefs, both by plaintiffs and us, show that, in fact, when a surety takes over, yes, they do assume antecedent obligations of the principal to the obligee, the party that they have contracted with. In this case, that is the bank. We have assumed the obligations of the principal, the producer of the film, to the bank. We fulfilled those obligations. We paid off his loan. We didn't, and no case says that because of that, because you've taken over in the context of this, you have automatically assumed all obligations to third parties, and, in fact, the cases say otherwise. I'm not really helped much by the cases because these things can be negotiated and you can get different results in different situations, and I'd really be helped more if you would refer me to what in the excerpt shows that they were just assuming from the time of the bond issuance or the time that they said they assumed. It's just a calculation of the damages. In terms of the argument during the trial, that was always an issue. In terms of why would my client assume an obligation before it even issued a bond? In other words. In order to get the job done. Because otherwise entertainment partners would. I represented a bonding company once, and we had to do some of that or else people would just leave. It wasn't this kind of bond. I don't know if it's analogous. It was just a building at a university. This contract existed for two months before my client was even involved. And, by the way, there were no misrepresentations. Yeah, but if you want to get the building done or the film done, you have to go beyond your contract sometimes. But our contract was not to get necessarily the film done. Our contract was either to get it done or pay off. So we had that option. My client had that option. And eventually they chose the option they wanted to go with. They paid off the loan. That's the only obligation. I'm sorry. It can be a business calculation. Are we better off just paying the limit of the bond and walking away, or are we better off getting completion so we can sell the completed asset? I agree with that. But, again, that is contractual, and that is the contract my client issued. They had the option. They chose the option. And that's where we are. So I think my time is up. By the way, did you suggest the 1.75? Is that what the amount was? 1.75. Did you suggest that amount to the jury as a possible damage award? What I did, Your Honor, and you'll find it in the excerpts of record, I had a chart. And I used the chart during closing arguments. And those numbers are all up there. But you never said it.  Ladies and gentlemen, blah, blah, blah. I never said it. If you reach this part of the special verdict, here's what I suggest is the amount that you ought to award. I don't believe I ever uttered those words. I said, you know, you can't hold us liable for this, and you can't hold us liable for this. And they were in columns. And I may have thrown out numbers. I don't recall, though. Okay. Thank you, Counsel. Thank you. Counsel, we went way over time with you, but take a minute anyway. Thank you. I'd like to respond to what Your Honor just raised. Not only did he not mention the $1.75 million number to the jury, he never argued that they could slice it at the point of bond issuance. That's nowhere in the record. What he did say, he picked a different date. And it was a critical date for our fraud claim. The bond was issued on January 13th. There was a conversation that occurred on January 24th. And this was a critical part of our fraud claim. We contended the conversation on January 24th occurred, and the bond company said certain things, and if the jury had believed that, certain things would have happened. What they argued at the trial was this conversation never occurred, but if you do believe that it occurred, it wasn't reasonable for entertainment partners to believe what someone said because of all these other factors. And so he suggested that they could slice it on that day. And he said if you agree with that, that the number, then the number is $2.3 million. So he did give them an option. Now, this was in the context of the fraud claim. Nowhere did he suggest that there was any ability to slice and dice it for purposes of the surety obligation claim. Let me just read California Civil Code Section 1589. A voluntary acceptance of the benefit of a transaction is equivalent to a consent of all the obligations arising from it so far as the facts are known or ought to be known to the person accepting it. Thank you, counsel. Thank you. SCIE v. XL is submitted. We'll return until at tomorrow. All rise.
judges: Noonan, Kleinfeld, Paez